Willie Lee **THOMPSON**

v.

**STATE FARM INSURANCE COMPANIES.**

George H. **SANSON** et al.

v.

Joseph C. **BERRY** and State Farm Mutual Automobile Insurance Co.

Bradley **BERRY**

v.

**STATE FARM INSURANCE COMPANY.**

Richard L. **COLEMAN**

v.

**STATE FARM INSURANCE COMPANIES.**

Civ. A. Nos. 4833, 5014, 5083 and 5084.

United States District Court
W. D. Louisiana, Lake Charles Division.

Sept. 19, 1956.

474

H. Alva Brumfield, Baton Rouge, La., Navarre & Ryder, Oberlin, La., for plaintiffs.

Plauche & Stockwell, Lake Charles, La., for defendants.

HUNTER, District Judge.

The matter before the Court consists of four separate suits for personal injuries consolidated for purpose of trial.

Alleging that their injuries resulted from the proximate negligence of Joseph C. Berry, the plaintiffs Willie Lee Thompson, Bradley Berry, and Richard Coleman bring their action alone and directly [1] under the Diversity Statute [2] against State Farm Mutual Automobile Insurance Company. The fourth suit, brought by George H. Sanson and Mamie Sanson, joined Joseph C. Berry as a party defendant. Thompson sues for $10,500; Berry for $20,000; Coleman for $20,000; and the Sansons for $50,950.

The alleged injuries resulted from an accident which occurred on July 2, 1954, on U. S. Highway 165 about one mile North of Kinder, Louisiana. The acci-

---

1. "Louisiana Direct Action Statute", LSA–R.S. 22:655.

2. 28 U.S.C.A. § 1332.

dent involved a vehicle driven by plaintiff, George Sanson, and a 1954 Chevrolet belonging to Thompson Berry and being driven by Joseph C. Berry, with the express permission of Thompson Berry. Mrs. Sanson was riding in her husband's vehicle at the time; Coleman, Bradley Berry and Thompson were riding in the 1954 Chevrolet.

The case was tried to the Court without a jury, and I find the facts to be these:

(1) The necessary diversity exists in each case, and the amount in controversy in each case exceeds $3,000.

(2) The 1954 Chevrolet involved in the accident was purchased by Thompson Berry in his own name, and the ownership, control and responsibility for its operation was his.

(3) At the time of the accident, the 1954 Chevrolet automobile was being driven and operated by Joseph C. Berry with the express permission and consent of his father, Thompson Berry.

(4) There was in full force and effect at the time of this accident a policy of public liability insurance issued by defendant State Farm Mutual, in favor of Thompson Berry, whereby the defendant insurance company agreed to insure and indemnify Thompson Berry, or anyone using the automobile with his permission, from all claims and judgments arising out of the negligent operation, use and maintenance of said automobile. Said policy provided a limit of coverage of $10,000 for any one accident and $5,000 for the injuries to any one person.

(5) Driving with Joseph C. Berry at the time of the accident as guests were the plaintiffs Willie Lee Thompson, Bradley Berry and Richard Coleman.

(6) The Sanson vehicle involved here was owned by plaintiff George H. Sanson, and driving with him was his wife, Mamie Sanson.

(7) The accident occurred in Allen Parish, Louisiana, on July 2, 1954 on U. S. Highway 165, about one mile North of Kinder, Louisiana, at a time when Mr. Sanson was driving his car in a northerly direction on the said highway.

(8) At the same time, the car being driven by Joseph C. Berry and in which Thompson, Bradley Berry and Coleman were guests, was proceeding in a southerly direction on the aforesaid highway.

(9) That as the automobile driven by Mr. Sanson reached a point about one mile North of the Town of Kinder, in Allen Parish, Louisiana, the 1954 Chevrolet being operated by Joseph C. Berry, suddenly and without warning veered to the Sansons' right side of said highway, crashing headlong into it.

(10) As a direct result of the collision, the plaintiffs Willie Lee Thompson, Bradley Berry, Richard Coleman, George H. Sanson and Mamie Sanson suffered injuries.

(11) The injuries suffered by each of plaintiffs were proximately caused by the negligence of Joseph C. Berry.

(12) Joseph C. Berry's acts of negligence, which were the proximate cause of the accident and resulting injuries were:

(a) In driving his automobile at the time of the accident at a speed of 55 miles per hour, which, under the circumstances, was an unreasonable and excessive speed.

(b) In not keeping a proper look-out.

(c) In not having his car under control.

(d) In driving his vehicle on the wrong side of the highway.

(e) In failing to give to the Sanson vehicle, for at least 200 feet before meeting it, one-half of the main traveled portion of the highway in violation of LSA-R.S. 32:232.

(f) In driving to the left side of the center line of the highway when the said left side was not free from oncoming traffic in violation of LSA-R.S. 32:233 (c).

(13) There is no evidence of contributory negligence on the part of Thompson, Bradley Berry, Richard Coleman, George H. Sanson and Mamie Sanson, and we conclude that they were guilty of none.

(14) As a result of the accident, George H. Sanson sustained serious and partially disabling injuries. He was hospitalized after the accident for approximately one week, and was unconscious for about 24 hours. He suffered severe chest injuries which included fractures of the 3rd, 4th, 6th and 7th ribs, and as diagnosed by hospital personnel, traumatic pneumonitis, which has left him with a painful chest. He also suffered a knee injury. Considering the evidence we think an award of $3,000 covering pain and suffering (past, present and future) would be reasonable and an additional amount of $5,500 for disability and loss of earnings would be commensurate with the loss shown.

(15) Mrs. Sanson, as a result of the accident, suffered a fracture in the distal third ulna of her right arm, and incurred a serious disability in that arm. She also received severe lacerations about the face, neck, right shoulder and index finger of the left hand. Considering the evidence, we think an award of $2,500 covering pain and suffering (past, present and future) would be reasonable, and an additional amount of $2,500 for disability, would be commensurate with the loss shown.

(16) Willie Lee Thompson, as a result of the accident, suffered a comminuted fracture of the right femur, a fracture of the right tibia, abrasions of the left leg and a contusion of the brain. He remained unconscious for about eight days and was confined to the hospital for a period in excess of three months. He missed approximately one year from work, and even now suffers some disability. Considering the evidence, we think an award of $6,000 covering pain and suffering (past, present and future) would be reasonable and that an additional sum of $4,000 for disability and loss of earnings would be commensurate with the loss shown.

(17) Richard Lee Coleman also suffered injuries as a result of the accident. His injury was to the upper right extermity. He remained in the hospital from July 2, 1954, to January, 1955. He is now in the Army, even though he says he is not able to do his regular duties. He has a permanent disability of 10% of his right arm. Under the evidence, we think an award of $2,000 covering pain and suffering (past, present and future) would be reasonable, and an additional amount of $3,000 for disability would be commensurate with the loss shown.

(18) Bradley Berry sustained a compound fracture of the jaw. He says that he still has severe headaches and cannot use his jaws without pain. Considering the evidence, we think an award of $1,500 covering pain and suffering (past, present and future) would be reasonable and commensurate with the loss shown.

### Discussion

■ The real contest in this trial was not on the questions of negligence and quantum. State Farm seeks to absolve itself from liability principally on the grounds that there was no coverage on July 2, 1954, the date of the accident. The policy defenses were:

(a) Willful misrepresentation of material facts in obtaining the insurance;

(b) Cancellation for non-payment of the premium due.

### Misrepresentation

Misrepresentation in insurance matters is governed by LSA–R.S. 22:619, the pertinent part of which reads as follows:

"A. Except as provided in Subsection B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive."

The most recent case interpreting these provisions was decided by this Court in New Zealand Insurance Company, Ltd. v. Holloway, 123 F.Supp. 642. State Farm interprets the evidence here to bring this case within the orbit of the Court's decision there. They interpret

the evidence to show that the true owner of the 1954 Chevrolet was not Thompson Berry, a Negro who had been employed for many years by the Missouri Pacific Railroad, but his son, Joseph C. Berry. Consequently, they argue, the statement made by Thompson Berry in the application of April 17, 1954, wherein it was stated that the sole owner of the car was Thompson Berry is false, and was intentionally made to mislead State Farm. We do not agree that the evidence shows a willful misrepresentation of a material fact, and the Court now makes additional findings of fact as follows:

(19) Both the 1951 Ford and the 1954 Chevrolet were purchased by Thompson Berry in his own name, primarily for the use and convenience of his son, Joseph C. Berry, but he, Thompson Berry, retained the ownership, control and responsibility for the vehicles, and they were the property of Thompson Berry.

(20) Thompson Berry traded in the 1951 Ford, of which he was the record owner, in part payment of the price of the 1954 Chevrolet. The notes covering the remainder of the price were given to the Calcasieu Marine Bank by Thompson Berry in his own name, and the financing of both cars was done on the strength of the credit of Thompson Berry.

(21) The application made by Thompson Berry was in his own name, in a face to face transaction, for insurance on a car bought, financed and controlled by him, contained the disclosure that a person under the age of 25, his son Joseph C. Berry, would be a regular driver of the vehicle.

(22) In acquiring the pertinent policies of liability insurance, Thompson Berry did not make any willful misrepresentation of any material fact.

### Of the Two Subject Policies, Which if Either, was in Effect on July 2, 1954?

State Farm and the Sansons contend that the second policy presents the contract between the parties, and that the only issue remaining for resolution on the question of coverage is whether or not there was a cancellation of the second policy. The other plaintiffs say that while they would like to take this position because of the greater coverage in the second policy, they find themselves unable to do so because the first policy was never cancelled by Thompson Berry or by State Farm, either by mutual consent or by requirements of Louisiana statutory law, and that it, the first policy, was in full force and effect at the time of the accident on July 2, 1954, and accordingly, they should recover their damages from State Farm to the limit of the first policy.

These respective contentions necessitate further findings of fact, which are these:

(23) On March 13, 1954, Thompson Berry applied for a policy of liability insurance with State Farm on a 1951 Ford, of which he was the record owner and over which he had control. The application was made in a face to face transaction with Mr. John A. Navarre, the Company's duly authorized agent at Oberlin, Louisiana.

(24) Upon this application of March, 1954, State Farm issued a policy of liability insurance with limits of $5,000/10,000, bearing certificate No. 35 724–C13–18. This policy has heretofore and will hereafter be referred to as the "first policy." It was effective from March 13, 1954 to September 13, 1954. It was paid in full and delivered, and constituted a valid contract between State Farm and Thompson Berry, and if not cancelled would have been effective on July 2, 1954.

(25) On April 3, 1954, the 1951 Ford automobile was traded in by Thompson Berry on a 1954 Chevrolet. He, Thompson Berry, then again contacted Mrs. Dorothy Seale, State Farm's duly authorized agent at Oberlin, Louisiana, and informed her that he wished to transfer the insurance from the 1951 Ford to the 1954 Chevrolet, which he had bought as a replacement.

(26) Mrs. Seale suggested to Berry that he add a provision for medical payments to the policy. This suggestion was accepted by Thompson Berry and he

paid $3.00 then and there to Mrs. Seale for the medical payment coverage.

(27) Both Thompson Berry and Mrs. Seale considered that Thompson Berry's policy was merely being transferred from the Ford to the Chevrolet. Neither intended that a new policy be written or that the policy limits be raised. This is obvious from the testimony of Mrs. Seale and Thompson Berry, and is borne out by the fact that the premiums on the new policy, as filled out by Mrs. Seale, were identical with the premium on the old except for the $3.00,[3] and the Court finds that under these circumstances an ordinarily reasonably prudent person would consider the transfer was made and nothing else was due.

(28) Regardless of the intentions between the Company's agent and Thompson Berry, the company's regional office issued a brand new policy with an increased coverage of $10,000/20,000. The second policy was forwarded to Thompson Berry on April 18, 1954. It bears policy No. 36 753–D–17–18. Attached to the policy was a notice of additional premium due on the new policy in the amount of $15.75.

(29) What the regional office actually did was to increase the coverage, total up the bill for a new policy, and subtract therefrom the credit which Thompson Berry was owed under the old policy. Company officials testified that this was the usual procedure, and that they did not actually transfer policies.

(30) Under the terms of the policy (hereinafter quoted) the insured had an absolute right to transfer the insurance to the newly acquired automobile and the only thing that he would have owed would be any additional premium required because of the application of the insurance to such newly acquired automobile. Under the evidence in this case, there would have been no additional premium for a policy covering the same six months' period and for the same amount. The additional premium here was charged because the policy was written for a *new* six months' period, and because the policy limits were raised. The reason the policy limits were raised was because of the error on the part of the agent in filling out the application. However, it is apparent from the premium that no additional coverage was desired. The reason the policy was written for a brand new six months' term rather than merely transferred was, according to the testimony of the company officials, simply because they just did not handle their business that way, and that in reality, they do not write transfers, but merely give credit on a new policy.

(31) Paragraph (1) of the policy reads as follows:

"1. Coverage A—Bodily Injury Liability.

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, *caused by accident and arising out of the ownership, maintenance or use of the automobile.*" (Italics mine.)

(32) Paragraph IV(4) of the policy reads in pertinent part as follows:

"(4) Newly Acquired Automobile—an automobile, ownership of which is acquired by the named insured who is the owner of the described automobile, if the named insured notifies the company within thirty days following the date of its delivery to him, and if either it replaces an automobile described in this policy, * * *"

(33) Thompson Berry, a colored man with little education, never paid any additional premiums, being of the opinion that his policy had merely been transferred, and that therefore he had coverage fully paid under the old policy until September 13, 1954. This apparently

---

3. Compare premiums on Exhibit P–6 with those on the first policy. They are the same, except for the $3.00 referred to herein.

was also the thinking of Mrs. Seale, the company agent.

(34) On June 3, 1954, the company mailed a notice to Thompson Berry that an additional premium was due in the amount of $15.75, and that if not paid, his policy would be cancelled, effective June 16, 1954.

(35) On June 23, 1954, the company placed the file on the second policy in the regular channels for the computation of the premium to be refunded, treating the second policy as effectively cancelled on June 16, 1954.

(36) The accident involving the 1954 Chevrolet, out of which this case arises, occurred on July 2, 1954.

(37) On July 6, 1954, the company received notice of the claims under the policy and the file was transferred from the Service Department of the Company to the Claims Department.

(38) When the file had served its purpose in the Claims Department, it was returned to the Service Department, where calculation of unearned premium was computed in the regular course of business, and on July 19, 1954, the unearned premium in the amount of $16.25 was mailed to Thompson Berry.

(39) Thompson Berry, on the advice of his attorney, John P. Navarre, refused to accept the premium refund and returned it to the company.

There can be no question but that the "first policy" had been regularly applied for by the insured through the agent of defendant, and as a result of this application and acceptance of the risks by defendant, a policy of liability insurance was issued in March, 1954, for a period of six months, for which the premium was paid in full. Accordingly, this policy was in full force and effect at the time of the accident, July 2, 1954, unless that policy had been cancelled by the insured or the insurer prior to the date of the accident.

■ Cancellation of a contract of insurance may be effected by mutual agreement or under state statutory provisions authorizing cancellation. It is agreed that no statutory notice of cancellation was given on the "first policy." Defendant's contention is that the subsequent issuance of the second policy one month later was a cancellation of the first policy by mutual agreement and/or by novation.

■ As in the case of contracts generally, it is essential to the creation of a contract of insurance that there be an offer or proposal by one part and an acceptance by the other. If the acceptance varies the term of the offer, it is then a counter-offer and must be accepted by the party making the original offer.[4] Applying these principles to the present case, when Thompson Berry notified the company agent that he had replaced the 1951 Ford with a 1954 Chevrolet and requested a "transfer", he merely sought to do what the policy said that he could do under Paragraph IV(4) thereof. This was clearly his intention, as shown by his testimony, the testimony of the agent of defendant, and the premium placed on the application by defendant's agent. The company authorities charged with the actual issuance of the policy did not make the transfer. They did, in effect, make a counter-offer to issue a new policy with additional coverage and for a different period. Did Thompson Berry accept the counter-offer made to him of the new policy? If he did, the first policy of insurance was cancelled by mutual agreement, and the new policy came into being. If he did not accept the counter-offer of the defendant, then the second policy did not come into being and the first policy was not effectively cancelled. It is urged that Reeve, Case & Co. v. Phoenix Insurance Company, 23 La.Ann. 219, (decided March, 1871), is authority for a holding that assent of the insured is to be presumed by his silence. That case did not involve the question of whether or not the policy had been accepted, but whether or not if accepted both parties were bound by its clauses and provisions.

4. 44 C.J.S. Insurance § 232, et seq.

The law of Louisiana, as expressed in Louisiana LSA–Civil Code, Article 1818 [5] requires the Court to consider all the circumstances and decide whether or not in this particular case silence constitutes acceptance.

We agree with counsel for Coleman and Berry when he says in his brief:

"As much as counsels for the plaintiffs would like for the second policy of insurance to have been in effect, because of the increased coverage, nevertheless it appears to us, that indeed the necessary consent for the second policy to go into effect was lacking on the part of Thompson Berry. Here is a man who has very little education. He wanted to transfer his policy and so informed the agent of defendant. He was led to believe by her that this was what he was doing. He got the policy of insurance which on its face, with the exception of the amount of the premium is identical on its face with the previous policy which Berry had. The Testimony showed that when the defendant sent bills for the additional premiums, that Berry was confused and did not understand why additional premiums were needed, and attempted to contact the agent of defendant. These things indicate to us, that there was no meeting of the minds the second policy as required by law. See Civil Code Article 1798:"

"As there must be two parties at least to every contract, so there must be something proposed by one and accepted and agreed to by another to form the matter of such contract; the will of both parties must unite on the same point."

The first policy is still in full force and effect here, unless novation has occurred. Novation is a contract, consisting of two stipulations; one to extinguish an existing obligation, the other to substitute a new one in its place, Art. 2185, La.Civil Code. Novation is never presumed—it must be proven and the one urging it must prove it, Art. 2190, La.Civil Code.

■ It is the conclusion of the Court that the "first policy" was never cancelled by Thompson Berry or by defendant State Farm, either by mutual consent, novation, or by the requirements of the applicable Lousiana statutory law. Accordingly, it was in full force and effect at the time of the accident, July 2, 1954, and there was coverage under that policy of insurance at that time. It seems appropriate here to observe that if the transfer had been made as provided for in Paragraph IV(4) of the policy, as Thompson Berry and defendant's agent understood it was going to be made, there would have been no additional money owed, and there would have been coverage. The mistake which was made was on the part of defendant's agent, and they should not be permitted to profit by their own agent's mistake.

The conclusions hereinabove dispose of the case. However, if on appeal it is held that the first policy was cancelled by mutual agreement and the second policy substituted therefor, then it would be necessary to decide whether or not there was a timely cancellation of the second policy. Therefore, it seems good practice for the Court to express its findings on that problem. Especially is this true because of the Court's action in denying the motion for summary judgment on that part of the case.

■ Now that I have heard all the evidence, I am convinced that if the second policy was the contract between the parties, then and in that case it was legally and effectively cancelled.

The law relative the matter of cancellation by the company is found in LSA-

5. "Art. 1818. Where the law does not create a legal presumption of consent from certain facts, then, as in the case of other simple presumptions, it must be left to the discretion of the judge, whether assent is to be implied from them or not."

Revised Statutes, 22:636 which provides for the purposes necessary herein that:

The written notice must be mailed to the insured not less than 5 days prior to the effective date of the cancellation and the portion of any premium paid or unearned because of the cancellation must be mailed to the insured or such person *as soon as practicable following such cancellation.* (Italics mine).

I conclude that this statutory provision was complied with by State Farm as to the second policy. Our Louisiana Courts have not passed directly on the question of "as soon as practicable following such cancellation," and consequently, we must turn to other jurisdictions.

In the recent case of Wallace v. State Farm Mutual Automobile Insurance Company, decided by the Supreme Court of Tennessee, 187 Tenn. 692, 216 S.W. 2d 697, 700, the Court had for consideration facts very similar to those involved in this case. The issue before the Court was whether or not the returned premium had been made "as soon as practicable after cancellation became effective." The wording in the policy concerning liability in the Wallace case is identical as that contained in the Louisiana Statutes quoted above.

In discussing the issue in the case the Court said:

"In any way we look at the matter, the balance in the hands of the company after the cancelation, merely creates a debtor creditor relationship. The policy contract does not require of Wallace (the policy holder) that he make a demand for this unearned premium. The company merely says that it will either pay this 'at the time cancelation is effective' or it 'shall be made as soon as practicable' thereafter. This was merely a promise by the company that if the returned premium did not come with the cancelation that it would be made with all promptitude considering the surrounding facts as to how long it would take to calculate

this unearned premium. The language 'as soon as practicable' means a reasonable time. Vanderbilt v. Indemnity Insurance Company of North America, 265 App.Div. 495, 39 N.Y.S.2d 808."

In holding that the cancellation of the policy was effective the Court said:

"It seems to us that in the absence of any proof and evidence before the Court as to how much time would be 'practicable' in order to conform to the language of the cancelation clause, that we cannot assume judicially or judiciously that the refund of the premium was not done as soon as practicable after cancelation. We must conclude, in the absence of proof to the contrary, that the insurance company refunded the premium in the regular routine manner, and followed the course of established bookkeeping and accounting practices."

From the testimony as to the method of calculating the unearned premium in the instant case and its return we believe the evidence shows conclusively that it was done in the regular routine manner, due consideration given to the number of policies handled by the Company and the fact that for a number of days the calculation and return of the unearned premium was interrupted while the Company was giving service on the claim made under this policy. Certainly the evidence shows that the unearned premium was calculated and returned in the regular routine manner and followed the company's established bookkeeping and accounting procedures.

In the case of Boston Insurance Company v. Rash, 263 Ala. 201, 82 So.2d 177, 178, the State Supreme Court of Alabama had the very question now before this Court on the interpretation of the phrase " 'as soon as practicable after cancellation.' " The pertinent facts show that on July 22, 1952, the insurance company issued a policy to the defendant. The policy apparently was for a period of one year. Of the total premium of $59 only $30 had been paid by the in-

sured. On November 21, 1952, the insurer mailed to the insured a letter stating that the policy would be cancelled as of December 3, 1952. There was an unearned premium owed to the insured of $8.31 which was never returned. The accident occurred on May 9, 1953. The Supreme Court of the State of Alabama thoroughly discussed the question involved herein and held that the cancellation was effective and thereafter there was merely a debtor-creditor relationship for the return of the unearned premium, and that the return of the unearned premium had nothing whatsoever to do with the effective cancellation of the policy. In the course of its opinion the Alabama Court referred to Six Blashfield, Section 3547, Pocket Part, to the effect that the weight of authority is in accord with its holding, citing the case of Wallace v. State Farm Mutual Automobile Insurance, supra. In analyzing the jurisprudence throughout the country on this particular point the Court states that only one decision was contrary thereto, a Louisiana case, Ellzey v. Hardware Mutual Insurance Co., La.App., 40 So.2d 24. However, that is no longer the law since the Supreme Court of Louisiana held in Romero v. Maryland Casualty Company, 223 La. 783, 66 So.2d 849, 850:

"The statute does not contemplate the inclusion of the unearned premium at the time of the notice of cancellation. The statute states that payment must be made to the insured or such person as is entitled thereto 'as soon as practicable following such cancellation.'"

We, in view of the strong reasoning of the majority opinion throughout the country, are logical in assuming that our Court would follow the great weight of authority on this point and would hold as did the Court in the Boston case and in the Wallace case.

In my opinion denying defendant's motion for summary judgment, I said:

"Furthermore, I am *not* convinced that the insured was not justified in believing that he was not in arrears. Furthermore, I am not sure myself that he was in arrears. Here, the policy was cancelled on June 16, 1954 because the full payment due by Berry in the amount of $15.75 had not been paid. Yet, the file reveals that on July 19th the Company refunded $16.56 to Berry, which represented the amount of unearned premium returnable upon cancellation of the said policy. It is apparent that $15.75 would have paid up the policy through October 27, 1954. It is also apparent that under the most liberal construction which could be made in favor of the insurer, there were enough dividends on hand to warrant Berry's believing the insurance was still in effect."

Of course, at that time the Court had not had the opportunity of hearing the evidence which was adduced at the trial. Mr. Kearney (Tr. 227–228) explained in detail the calculations of the unearned premium. The second policy was for a period of six months from April 16, 1954. The total premium was $41.40. Of this amount $21.05 was credited from the transfer of the policy on the 1951 Ford and $3 was paid at the time of the proposed transfer for medical payments. In addition, there was a premium credit on the first policy in the amount of $1.60. This accounts for the balance of $15.75.

### Conclusions of Law.

(1) The Court has jurisdiction of the parties and the subject matter under the diversity statute. 28 U.S.C.A. § 1332.

(2) The law to be applied in this case is the law of Louisiana. Erie R. R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

(3) LSA–R.S. 32:233: "* * * C. The driver of a vehicle shall not drive to the left side of the center line of the highway in overtaking and passing another vehicle traveling in the same direction, unless such left side is clearly visible and free from oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in perfect safety. Whenever an accident

occurs under such circumstances, the responsibility therefor shall rest prima facie upon the driver of the vehicle doing the overtaking or passing." * * *

(4) LSA–R.S. 32:231: "Upon all highways, including intersections, of sufficient width, except one-way streets or roads, the driver of a vehicle shall drive it upon the right half of the highway and shall drive a slow moving vehicle as closely as possible to the right hand edge of curb of the highway unless it is impracticable to travel on such side of the highway, and except when overtaking and passing another vehicle, subject to the limitations applicable in overtaking and passing set forth hereafter."

(5) LSA–R.S. 32:232: "Drivers of vehicles proceeding in opposite directions shall pass each other to the right, each giving the other for at least two hundred feet before meeting, one half of the main travelled portion of the highway."

(6) The violation of a law is per se negligence and is actionable when the proximate cause of injuries to others. Stuckey v. Hayden, La.App., 3 So.2d 443.

(7) No person is permitted to operate any vehicle upon the highways of Louisiana at other than a reasonable and proper speed under the circumstances, and whoever operates a vehicle in violation of this speed limitation is prima facie at fault and responsible for any accident proximately caused by such operation. LSA–R.S. 32:227.

(8) An automobile driver's negligence is not properly imputable to guest passengers.

(9) The burden of proving contributory negligence is on the party alleging it.

(10) A contract is incomplete unless there is a meeting of the minds of the parties upon a common ground of a mutual understanding of facts and of subject matter. Not only must the parties understand alike, but their contract must afford a complete expression of this meeting of the minds, and leave no material element unexpressed. Offer and assent must coincide, and the result must be a complete obligation. Jones v. Janes, 156 La. 715, 101 So. 116.

(11) "As there must be two parties at least to every contract, so there must be something proposed by one and accepted and agreed to by another to form the matter of such contract; the will of both parties must unite on the same point." LSA–C.C. Art. 1798.

(12) "Express consent must be given in a language understood by the party who accepts, and the words by which it is conveyed must be in themselves unequivocal; if they may mean different things, they give rise to error, which, as is hereinafter provided, destroys the effect of a contract." LSA–C.C. Art. 1812.

(13) Silence and inaction are also, under some circumstances, the means of showing an assent that creates an obligation. LSA–Civil Code Art. 1817. But, where the law does not create a legal presumption of consent from certain facts, it must be left to the discretion of the judge, whether assent is to be implied from them or not, LSA–Civil Code Art. 1818.

(14) Novation is a contract consisting of two stipulations, one to extinguish an existing obligation, the other to substitute a new one in its place. LSA–Civil Code, Art. 2185.

(15) The preexistent obligation must be extinguished, otherwise there is no novation; if it be only modified in some parts, and any stipulation of the original obligation be suffered to remain, it is no novation. LSA–Civil Code Art. 2187.

(16) Novation is not presumed; the intention to make it must be clearly shown. LSA–Civil Code Art. 2190.

## Conclusion

At the time of the trial, it was proven by the plaintiffs that in March of 1954 the first policy had been regularly applied for by the insured, through the agent of State Farm, and that as a result of this application and acceptance of the risk by defendant, the first policy was issued in March, 1954 for a period of six months, and the premiums therefor fully paid for by the insured. Ac-

cordingly, this policy was in full force and effect at the time of the accident, July 2, 1954. It was not cancelled by statutory notice, by mutual agreement, or by novation.

Defendant's contention that there was no coverage under the first policy because it covered a 1951 Ford which was not involved in the accident does not absolve them from liability, because under Paragraph IV(4) of the policy the 1954 Chevrolet was an automobile, ownership of which was acquired by the named insured to replace the 1951 Ford described in the policy. The insured notified the company's agent of this fact within 30 days following the date of his acquisition of the replacement.

Judgment in conformity with the findings and conclusions here expressed should be presented.